IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEVE STRADFORD, | ) | CASE NO. 1:16CV1161 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Steve Stradford ("Stradford") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

**I. Procedural History**

Stradford filed an application for SSI on November 1, 2012, alleging a disability onset date of January 31, 2004. Tr. 12, 170. He alleged disability based on the following: back pain, gout, diabetes, bronchitis, and high blood pressure. Tr. 196. After denials by the state agency initially (Tr. 95) and on reconsideration (Tr. 96), Stradford requested an administrative hearing. Tr. 118. A hearing was held before Administrative Law Judge Traci M. Hixson ("ALJ") on September 4, 2014. Tr. 31-68. In her January 16, 2015, decision (Tr. 12-24), the ALJ

1

determined that there are jobs that exist in significant numbers in the national economy that Stradford can perform, i.e., he is not disabled. Tr. 23. Stradford requested review of the ALJ's decision by the Appeals Council (Tr. 8) and, on March 18, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Stradford was born in 1966 and was 46 years old on the date his application was filed. Tr. 22. He went as far as the eleventh grade in school and was in special education classes. Tr. 60. He previously worked as a cleaner. Tr. 43.

### B. Relevant Medical Evidence[1]

On October 10, 2012, Stradford saw Kiran Mohan, M.D., a primary care provider, for a physical exam. Tr. 484-485. Dr. Mohan noted that Stradford has no unusual anxiety or evidence of depression. Tr. 485. No learning needs were identified. Tr. 485.

On November 8, 2012, Stradford began seeing nurse practitioner Belinda Brown at Care Alliance. Tr. 499. He reported that he was staying with a friend and expressed frustration and that he needed help with housing. Tr. 500. He also stated that he was feeling down from chronic illness. Tr. 500. Upon exam, he appeared well and was interactive. Tr. 501. Brown indicated that Stradford would be screened for depression, which she described as mostly situational. Tr. 501.

On November 28, 2012, Stradford complained of sleeping all the time, being depressed, and overeating. Tr. 515. Brown diagnosed him with depression, with his housing situation a big obstacle for him currently, and prescribed an anti-depressant (citalopram/Celexa). Tr. 516.

---

[1] Stradford does not challenge the ALJ's findings regarding his physical impairments. Accordingly, only the medical evidence relating to Stradford's challenged mental impairments is summarized and discussed herein.

On February 20, 2013, Stradford informed Brown that he did not find that Celexa improved his mood and he complained of feeling "high." Tr. 569. He had gotten a new place to stay. Tr. 569. He still complained of sleeping all the time, depression, and overeating. Tr. 569.

On April 17, 2013, Stradford reported to Brown that he thought his Celexa was helping his depression and it was helping him to be calmer. Tr. 639-640.

On July 5, 2013, Stradford denied depression and reported doing much better since he started taking Celexa. Tr. 690. He did not feel depressed most days but was still oversleeping, overeating, and some days he had fatigue. Tr. 690. Brown assessed his depression as stable and continued Celexa. Tr. 691.

On September 26, 2013, Stradford saw physician's assistant Christina Stehouwer at Care Alliance. Tr. 685. Stehouwer stated that Stradford was cooperative and assessed his mood as stable with the continued use of Celexa. Tr. 685.

On May 4, 2014, Stradford saw Stehouwer. Tr. 695. He was out of his medications. Tr. 695. Upon exam, he was cooperative. Tr. 695. Stehouwer resumed his Celexa. Tr. 696. On June 12, 2014, Stehouwer again described Stradford as cooperative. Tr. 703.

On October 9, 2014, Stradford saw certified nurse practitioner Kevin Nash at MetroHealth for a routine physical exam. Tr. 745-749. He reported feeling good since his last physical exam but complained of depression. Tr. 745.

On November 15, 2014, Stradford stated that he felt jittery during the day at times; Nash decreased his Celexa dosage from 20 mg to 10 mg. Tr. 785. Upon exam, he was cooperative. Tr. 786.

At none of these visits did Stradford endorse any symptoms of psychosis, including hallucinations.

3

C. **Medical Opinion Evidence**

   **1. Consultative Examiner**

First exam: On January 24, 2006, Stradford saw psychologist David V. House, Ph.D., for a consultative examination in connection with a prior disability application. Tr. 12, 406-412. Dr. House stated that Stradford appeared at his examination to be actively hallucinating. Tr. 406. He described Stradford's grooming and hygiene as fair; Stradford stated that he bathed every other day. Tr. 407-408. Stradford reported having advanced to the ninth grade in school, receiving poor grades, that he was in special education, and he did not know how to read or write. Tr. 406. Dr. House commented that he presented as disorganized and intellectually limited "and it became abundantly clear that he is psychotic later on." Tr. 408. He did not understand the meaning of the words "impulsive" and "motivation." Tr. 408. He stated that he engaged in no activities of daily living and just sat in his room. Tr. 410. He was unable to perform a serial seven subtraction test and was able to recall one out of three objects after five minutes. Tr. 409. He reported ongoing auditory hallucinations, paranoid thought content, anxiety attacks, social isolation, mood swings, and nightmares. Tr. 408-409.

Dr. House attempted to administer the Wechsler Adult Intelligence Scale III, but Stradford's scores were so low that Dr. House concluded that his score was not valid. Tr. 410. He wrote, "The evaluator does not believe that Mr. Stradford is quite this retarded and it is rather apparent that he is psychotic." Tr. 410. He estimated Stradford's premorbid IQ to be "in the neighborhood of 70 but certainly no information was presented to suggest exactly what his pre-morbid IQ might be." Tr. 410. He diagnosed Stradford with psychotic disorder, post-traumatic stress disorder (PTSD), and borderline intellectual functioning. Tr. 411. He assigned a global assessment of functioning ("GAF") score of 30 based on Stradford's reports of auditory

4

hallucinations and paranoid ideations.[2]  Tr. 412.  He opined that Stradford had several marked functional limitations and his overall level of functioning was at a reduced level of efficiency.  Tr. 411.

Second exam:  Seven years later, on March 23, 2013, Dr. House performed another consultative examination of Stradford.  Tr. 620-625.  Stradford was driven to the appointment by his uncle.  Tr. 620.  He stated that he does not have friends.  Tr. 621.  He stated that he had smoked marijuana that he had gotten from a friend about a month prior to the exam.  Tr. 621.  He reported a low energy level caused by shortness of breath.  Tr. 622.  His appetite was "way better" than it had been.  Tr. 622.  He was depressed "all the time."  Tr. 622.  Dr. House commented that he appeared disorganized and that his grooming and hygiene were "at best fair."  Tr. 622.  He engaged in limited activities of daily living: he cleaned a little bit, did not cook, friends did his laundry, and, although he would ride to the grocery store when someone would take him, he stayed in the car.  Tr. 624.  He only slept three hours in a twenty-four-hour period.  Tr. 622.  He had paranoid thoughts but no auditory or visual hallucinations, although he reported auditory and visual effects when half asleep.  Tr. 623.  He had problems maintaining a train of thought and did not know serial subtractions.  Tr. 623.   He could recall two of three objects after five minutes.  Tr. 623.  He had tangential speech, adequate eye contact, and was orientated to person, partially to place, and broadly adequate to time.  Tr. 622-623.  Dr. House did not repeat IQ testing.

Dr. House concluded that Stradford's condition did not appear to be significantly different from when he last saw him in 2006.  Tr. 624.  He opined that Stradford would have

---

[2]  GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)."  *Id*.

difficulty with following instructions, would be disruptive and dysfunctional in a work setting, and that his overall level of functioning is at a reduced level of efficiency. Tr. 624-625. He again diagnosed Stradford with psychotic disorder, PTSD, and borderline intellectual functioning; assigned a GAF score of 30; and opined that he had "essentially major impairments in almost all areas of functioning." Tr. 625. Stradford had a poor prognosis for improvement and his condition appeared chronic and essentially undifferentiated. Tr. 625.

### 2. State Agency Reviewers

On April 5, 2013, state agency reviewing psychologist Bruce Goldsmith, Ph.D., reviewed Stradford's record.[3] Tr. 80-86. Dr. Goldsmith opined that Dr. House's examination findings were "entirely inconsistent with how the [claimant] behaves and what he indicates his function to be elsewhere in the file and must be viewed as having limited credibility." Tr. 85. He explained that Dr. House's opinion heavily relied upon Stradford's subjective reports and appeared to be based upon Dr. House's prior exam in 2006, was unsupported by the totality of the evidence, and sharply contrasted with the other evidence of record. Tr. 87, 92. Specifically, he noted that Stradford provided conflicting activities of daily living and there was no evidence of a history or symptoms of psychosis anywhere in the record. Tr. 92. Dr. Goldsmith identified Stradford's activities of daily living (leaving the house and riding the bus independently, handling money, shopping for himself, and managing self-care and household tasks) and acknowledged his reported depressive symptoms for which he took Celexa. Tr. 87, 90. Dr. Goldsmith wrote that, although Stradford presented with some disorganization at his consultative examination, the record showed that he was able to make decisions about his own living situation and medical care, etc. Tr. 90. He commented that Stradford was found to be somewhat lacking in motivation

---

[3] Dr. Goldsmith's opinion was at the reconsideration level. Tr. 84-86. Initially, there was no reviewing physician for Stradford's mental impairments, presumably because he did not allege mental impairments in his disability application (Tr. 196).

6

on tasks in which he did not have a strong interest, such as his physical therapy evaluations. Tr. 90.

Dr. Goldsmith concluded that Stradford had mild limitations in activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation. Tr. 86. He opined that Stradford could perform tasks requiring a limited period of focus to complete; would require some flexibility in scheduling his work schedule and breaks during periods when he would have more symptomology; was aware of social norms and could conform to these when motivated, but was unlikely to respond to negative feedback or peer pressure for tasks in which he showed less interest; should have intermittent supervision to confirm he is working towards production goals and to offer constructive feedback on items that are deficient; should have only superficial contact with others and should not perform tasks that must be completed before others could complete their work; would do best in a job with no strict deadlines or well established production goals; and could adjust to a change in routine if it was introduced gradually. Tr. 90-91.

**D. Testimonial Evidence**

**1. Stradford's Testimony**

Stradford was represented by counsel and testified at the administrative hearing. Tr. 34-62. He testified that he lives alone in an apartment. Tr. 36. Although at one time he did have a driver's license, he no longer had one and does not drive. Tr. 36. A friend brought him to the hearing. Tr. 36. He does not prepare meals and gets his food from his girlfriend, who helps him out. Tr. 38. She does "everything" and lives in his building. Tr. 38. She cooks, cleans, does laundry, and goes grocery shopping for him. Tr. 38. He skips taking a shower "maybe one day

out of the week." Tr. 38. He watches television but does not read because he cannot read "that good." Tr. 39. The ALJ referenced the function report that Stradford filled out and asked him whether he completed the form or not; Stradford stated that his girlfriend may have filled it out. Tr. 40. His girlfriend fills out all his paperwork and, if she is not around, he will go to another individual in his building "that takes care of everything," such as paperwork. Tr. 41. He has diabetes and checks his blood sugar every two days when his friend comes down. Tr. 51. His aunt also comes over and checks on him sometimes. Tr. 52.

Stradford stated that he does not belong to any clubs, groups, or organizations. Tr. 41. He does not visit with family or friends and they do not come to visit him. Tr. 41. He has "some family, but I don't visit them and they don't visit me. I don't like to be around a lot of people." Tr. 41. He later stated that he sees "certain family." Tr. 52. He wakes up at about 8:00 in the morning and usually watches television. Tr. 42. Sometimes his friend will come over and keep him company. Tr. 42. She comes over every day. Tr. 42. He goes out onto his porch but does not go outside his building too much unless he has a doctor appointment, in which case "transportation" comes to get him. Tr. 42. He sometimes talks on the phone and he knows his neighbors. Tr. 43. He uses a cane that his friend made for him. Tr. 58. He takes naps for about two hours. Tr. 43.

Stradford previously worked for a temp agency and cleaned for a healthcare facility, doing things like emptying trash and mopping the floor. Tr. 43-44. He is still taking his Celexa for depression, and it is helping him as long as he is not around a lot of people. Tr. 49. He just stays home because otherwise he will "flip out" on people; i.e., he will talk to them bad. Tr. 49-50.

8

Stradford went as far as the eleventh grade in school and left when he was "maybe 17." Tr. 61. He has back pain, high blood pressure, gout, asthma, diabetes, and, a long time ago, had gunshot wounds in his shoulder and back that still bother him. Tr. 45, 48-49, 51, 54. He received his health care through Care Alliance and Metro. Tr. 61. These facilities never referred him to mental health services. Tr. 61. Emotionally or mentally he thinks he is doing "I guess all right. I don't know, I might wonder." Tr. 61. The Celexa is helping him "a little bit, not really"; when asked what he is hoping the Celexa will help him with, he stated, "I don't know, I just want the pain gone." Tr. 61-62.

### 2. Vocational Expert's Testimony

Vocational Expert Mark Anderson ("VE") testified at the hearing. Tr. 62-67. The ALJ discussed with the VE Stradford's past relevant work as a cleaner. Tr. 63. The ALJ asked the VE to determine whether a hypothetical individual of Stradford's age and educational background could perform any jobs in the regional or national economy if that person had the following characteristics: is able to lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk for six hours a day and sit for six hours a day, but would need a sit/stand option every hour for about five minutes that would not cause him to leave the workstation; can frequently climb stairs and ramps and occasionally climb ladders, ropes and scaffolds; can occasionally stoop, kneel, crouch and crawl; can occasionally reach overhead; cannot be exposed to concentrated levels of pulmonary irritants such as fumes, dusts, gases, odors or chemicals; can perform simple, routine tasks with simple, short instructions, make simple decisions, and have few workplace changes; can have superficial interaction with co-workers, supervisors and the public, i.e., no negotiations or confrontations; and cannot read instructions, write reports, or perform math calculations as essential functions of job duties. Tr.

9

64. The VE testified that such a person could not perform Stradford's past work but could perform work as an assembler of small products (217,000 national jobs, 10,000 Ohio jobs, 3,500 northeast Ohio jobs), inspector and hand packager (235,000 national jobs, 22,500 Ohio jobs, 4,500 northeast Ohio jobs), and assembler of printed products (175,000 national jobs, 22,000 Ohio jobs; 4,000 northeast Ohio jobs). Tr. 64-65.

Next, the ALJ asked the VE if his answer would change if the hypothetical individual described above would be absent at least three times per month. Tr. 65. The VE answered that such an individual would be incapable of performing competitive work. Tr. 65.

Stradford's attorney asked the VE to consider whether the individual described in the ALJ's first hypothetical could still perform the inspector and assembler jobs previously mentioned if the individual were limited to sedentary work. Tr. 66. The VE answered that the jobs mentioned could be performed at the sedentary level. Tr. 66. Stradford's attorney asked if an inconsistent pace and persistence in an individual was equivalent to off-task behavior, and the VE replied that it was. Tr. 66. Stradford's attorney asked if work would be precluded for an individual who was off-task for more than 15 percent of the time. Tr. 67. The VE stated that such a limitation would preclude work. Tr. 67.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her January 16, 2015, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since November 1, 2012, the application date. Tr. 14.

2. The claimant has the following severe impairments: degenerative disc disorder of the lumbar spine, asthma, gout, hypertension, obesity, depressive disorder, borderline intellectual functioning. Tr. 14.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 15.

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR §416.967(b) except that he can lift and carry 20 pounds occasionally, and 10 pounds frequently; can stand and walk for up to six hours, and sit for up to six hours, with a sit/stand option every hour for about five minutes, but would not need to leave the work station during that time. He can occasionally climb stairs and ramps, occasionally climb ladders, ropes, and scaffolding; occasionally stoop, kneel, crouch and crawl, but can balance. He can reach in front, occasionally reach overhead, can handle, finger and feel. He should avoid concentrated levels of pulmonary irritants such as fumes, dusts, gasses, odors, and chemicals. He can perform simple, routine tasks, with simple, short instructions, making simple decisions, having few workplace changes. He can have superficial interaction with coworkers, supervisors and the public. There should be no negotiations or confrontations in those interactions. He should not be required to read instructions, write reports, or perform math calculations as essential functions of the job duties. Tr. 17.

5. The claimant is unable to perform any past relevant work. Tr. 22.

6. The claimant was born on October 27, 1966, and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 22.

7. The claimant has a limited education and is able to communicate in English. Tr. 22.

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled. Tr. 23.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 23.

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 1, 2012, the date the application was filed. Tr. 24.

### V. Parties' Arguments

Stradford objects to the ALJ's decision on two grounds. He asserts that the ALJ erred when evaluating the opinion of the consultative examiner, Dr. House, and when she found that Stradford did not meet Listing 12.05. Doc. 13, pp. 8-13. In response, the Commissioner submits that substantial evidence supports the ALJ's findings with respect to Dr. House's opinion and Listing 12.05. Doc. 16, pp. 8-17.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A. Substantial evidence supports the ALJ's consideration of Dr. House's opinion**

Stradford argues that the ALJ erred when she considered the opinion of Dr. House, the consultative examiner.  Doc. 13, p. 9.  An ALJ is required to evaluate a medical opinion by considering the following factors: the examining relationship, treatment relationship, the supportability of the opinion, and the consistency of the opinion with the record as a whole.  20 C.F.R. 404.1527(c).

In considering Dr. House's opinion, the ALJ explained,

> According to the medical record, the claimant has had no significant psychological treatment or therapy.  David V. House, Ph. D., examined the claimant in a consultative psychological examination in 2006 relating to one of the claimant's earlier applications for disability benefits. (3F)  Dr. House diagnosed the claimant with psychotic disorder, borderline intellectual functioning, and assigned him 30 on the global assessment of functioning (GAF) scale, indicating that the claimant's behavior is influenced by delusions or hallucinations. (3F/7, 8)  Dr. House attempted to administer the Wechsler Adult Intelligence scale test to the claimant but terminated the test because Dr. House believed that the claimant's psychosis interfered with the test's validity.  (3F/6)  Dr. House examined the claimant again in March 2013, and once again diagnosed him with psychotic disorder, and assigned him a GAF score of 30. (19F/7)  A GAF score represents a clinician's subjective opinion as to an individual's overall level of functioning at a given time.  However, in this case, there is nothing in the medical record to support this level of severity.  No treating sources diagnosed a psychotic disorder or anything approaching the limited level of functioning assigned by Dr. House. Accordingly, both of his opinions are given little to no weight.

Tr. 21.

Stradford asserts that the ALJ "summarily rejected [Dr. House's] findings" arbitrarily and without identifying "good reasons" for doing so.  Doc. 13, p. 9.  First, an ALJ is required to provide "good reasons" for giving a *treating* physician's opinion less than controlling weight, and Dr. House is not a treating physician.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (a procedural requirement associated with the treating physician rule is that an ALJ must provide "good reasons" for discounting the opinion); 20 C.F.R. § 404.1527 ("We will always give good reasons in our ... decision for the weight we give your treating source's

14

opinion."). Second, the ALJ did not summarily or arbitrarily reject Dr. House's findings; she explained, accurately, that his opinion was unsupported by and inconsistent with the other evidence in the record. *See id.* (the ALJ considers the examining relationship, treatment relationship, the supportability of the opinion, and the consistency of the opinion with the record as a whole.). And the ALJ gave "great" weight to the opinion of state agency reviewing psychiatrist Dr. Goldsmith, who, she explained, found Dr. House's opinion to be "entirely inconsistent" with the record, including Stradford's behavior observed by numerous medical professionals over time. Tr. 21. This was not error. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (there is no requirement that an ALJ give greater weight to an examining source opinion than a state agency reviewer's opinion).

Stradford criticizes the ALJ for finding that he had no significant psychological treatment or therapy. Doc. 13, p. 9. However, he does not dispute that he in fact had no significant psychological treatment or therapy. Instead, he contends that he has been "essentially homeless and getting his medical care through Care Alliance and Frontline" and appears to suggest that he was unable to access mental health treatment. Doc. 13, pp. 9-10. But he has been living in an apartment since at least February 2013; prior to that he was staying with a friend and, before then, with his mother. Tr. 415, 500. In other words, he was not homeless. He does not assert that he needed, but was not able to obtain, psychological treatment or therapy. Instead, the record shows that the two providers he saw regularly at Care Alliance, and one provider at MetroHealth, prescribed him Celexa for his depression; the Celexa helped his depression; and he continued to take it thereafter, as the ALJ noted. Tr. 516, 785, 20. The fact that his providers did not refer him for further psychological treatment does not mean that Stradford lacked resources to obtain this treatment or did not know that he needed treatment. Rather, it shows that his

15

providers who regularly saw him did not deem it necessary. And the fact that there is no treating source diagnosis in the record does not describe an error by the ALJ, as Stradford appears to suggest. Doc. 13, p. 10.

Essentially, Stradford urges this Court to reweigh the evidence, which the Court cannot do. *See Garner*, 745 F.2d at 387. The ALJ did not err when giving little or no weight to Dr. House's opinion.

### B. The ALJ did not err in her Step Three determination

At Step Three, an ALJ considers whether the claimant has an impairment that meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. §404.1520(a)(4)(iii). A claimant must meet all of the specified medical criteria to show that his impairment matches an impairment in the listings; an impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Listing 12.05, which pertains to intellectual disability, provides,[5]

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Pt. 404, Subpt. P, App.1. In order to satisfy the diagnostic description, a claimant must prove that he meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. App'x 672, 675 (6th Cir. 2009). Additionally, a claimant must meet at least one of the following requirements:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

---

[5] Listing 12.05 was formerly titled "mental retardation." *See* 78 Fed.Reg. 46,499-01, 2013 WL 3936340 (August 1, 2013).

16

      B. A valid verbal, performance, or full scale IQ of 59 or less;

      C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

      D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

        1. Marked restriction of activities of daily living; or
        2. Marked difficulties in maintaining social functioning; or
        3. Marked difficulties in maintaining concentration, persistence, or pace; or
        4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Supbt. P, App.1.

The ALJ found that Stradford had mild restrictions in activities of daily living, moderate restrictions in social functioning and concentration, persistence or pace, and no episodes of decompensation of extended duration. She continued:

> Turing back to Listing 12.05, the requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. In this case, the claimant has "no problem" in taking care of his own personal needs, and he has not exhibited an inability to follow instructions. (9E/2)
>
> As for the "paragraph B" criteria, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less.
>
> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. There is no valid IQ score for the claimant in the record at all, despite numerous psychological evaluations.

Tr. 17.

Stradford argues that he "likely" satisfies the B, C and/or D paragraphs. Doc. 13, p. 12. In support of his assertion, he primarily relies on Dr. House's opinion, which the ALJ gave little or no weight to, as described above. Moreover, Dr. House did not complete IQ testing on

17

Stradford and only estimated his IQ to be "in the neighborhood of 70." Tr. 410. Stradford argues that this case should be reversed so that he can undergo an additional intelligence test that results in a valid score. Doc. 13, p. 12. However, an ALJ is not required to order additional testing, and the ALJ here did not err in not doing so. *Foster v. Halter*, 279 F.3d 348, 355-356 (6th Cir. 2002); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986); 20 C.F.R. § 404.1517. Finally, although Stradford asserts that he satisfies the paragraph B, C or D criteria, he does not allege that he satisfies the introductory paragraph to Listing 12.05, which requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Supbt. P, App.1, Listing 12.05. *Zebley*, 493 at 530 (A claimant must meet all of the specified medical criteria to show that his impairment matches an impairment in the listings; an impairment that manifests only some of those criteria, no matter how severely, does not qualify."). There is no evidence in the record of an onset of impairment before age 22. *See Foster*, 279 F.3d at 354-355 ("A claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled[,]" including that the condition manifested itself before age 22).

In a footnote, Stradford contends that the ALJ committed an error when she cited Stradford's functional report wherein he stated that he was able to care for his own needs, because he testified at the hearing that his girlfriend filled out his functional report. Doc. 13, p. 12, n.7. First, Stradford testified that his girlfriend "maybe" filled out his report, a fact that the ALJ acknowledged. Tr. 18. Second, regardless of who filled out the report, Stradford does not assert that the answers in the report were incorrect. Indeed, elsewhere in the record Stradford

18

told providers that he was independent with his self-care and activities of daily living, as the ALJ observed. Tr. 19.

The ALJ's consideration of Listing 12.05 is supported by substantial evidence. Therefore, it must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

### VII. Conclusion and Recommendation

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: March 16, 2017

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)